In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00047-CV


______________________________




SOUTHLAND HEALTH CARE CENTER, L.P., Appellant



V.



NATHAN ROBERTS, Appellee




 


On Appeal from the 217th Judicial District Court


Angelina County, Texas


Trial Court No. CV-39,685-06-06




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 Southland Health Care Center, L.P., the sole appellant in this case, has filed a motion seeking
to dismiss its appeal. Pursuant to Tex. R. App. P. 42.1, the motion is granted.

 We dismiss the appeal.


 Bailey C. Moseley

 Justice


Date Submitted: May 29, 2007

Date Decided: May 30, 2007



TRONG>

I. FACTUAL AND PROCEDURAL HISTORY 

 During the day prior to the evening of the assault on him on August 7, 2007, seventy-six-year-old Mitchell Manning led a routine life set by the demands of his Shady Oaks Mercantile
Convenience Store and his trucking company (a small enterprise mostly involved in transporting
rocks, sand, and soil). The store opened at 7:00 a.m. and closed at 8:00 p.m. In addition to working
in the store, Manning counted the money every night and placed it in a pouch for deposit the next
morning. After completing his routine on August 7, Manning closed the store at about 8:10 or 8:15
and made the short, four-mile drive to his home in his white Dodge pickup truck. 

 Manning had the trusting habit of never locking the doors to his home. On August 7, this
proved to be a bad habit. As he entered his front door, Manning discovered it to be partially blocked,
a blocking which Manning initially believed to be caused by his dog, which stayed in the house. 
Instead of discovering the dog at the door, Manning was faced with a tall man in a ski mask, holding
a gun. The masked man slammed the door into Manning, grabbed him, and then kicked him into
a glass gun case. Shards of the gun case's shattered glass lacerated Manning's hands and abdomen,
causing him to bleed. The intruder shoved his left knee onto Manning's back and placed a revolver
to Manning's head. At that point, a second, smaller intruder donning a ski mask appeared in
Manning's sight. Together, the intruders stood Manning up and told him they only wanted his
money. They moved Manning to the den, laid him face down, grabbed his keys, pocket knife,
passport, and wallet, and tied his hands behind his back with a phone charger cord and electrical
tape. Holding the pistol to his head, the intruders threatened Manning's life, moved him into the
master bedroom, and asked him whether he had any more guns in the home. Manning reported to
them that there was a Smith and Wesson revolver under the pillow on the bed, a .12-gauge shotgun
in the closet, and a shotgun, rifle, and pistol in the pickup Manning had been driving. The intruders
tied Manning's feet with duct tape and forcefully pushed him backward into the closet, where his
head was slammed into the rear wall, causing him to begin bleeding from an abrasion or cut suffered
from the blow. The taller intruder informed Manning that "she" (referring to the other, smaller
intruder) was going to start the truck and that he would shoot if he heard Manning trying to escape
from the closet. Manning was left tied up, with blood running down his hands and arms, a shard of
glass still embedded in his abdomen, and a bleeding, injured head. 

 When the house fell silent, Manning slipped the electrical tape off of his hands, crawled to
the window, saw that his pickup truck was gone, and quickly inventoried the items missing from his
home. He determined that the intruders had stolen his guns, pocket knife, billfold with his driver's
license, social security and medicare cards, $600.00 in cash, and credit cards, in addition to his
ostrich-skin boots, cell phones, money he had brought from the convenience store (including coins
placed in a plastic bag), and a jewelry box containing wedding rings, necklaces, and silver dollars. 
Because the robbers had taken his cell phones, Manning had no means to report the incident from
his home. He walked to one of his large trucks used for hauling rocks and gravel and drove from
his home to the highway, where he hailed a passing pickup truck and had its driver call the police. 
The driver of the pickup truck took Manning to his home, where the good Samaritan and his wife
cleaned Manning up. Manning's daughter (who had been contacted) retrieved Manning and returned
him to his own home. 

 Officer Kevin Adair arrived and observed that Manning was shaken, scared, upset, and that
he had blood on his hands and abdomen. At Adair's recommendation, an ambulance was called and
Manning was taken to the hospital. 

 In an interview with investigator Wilford Gabbard, Manning described the tall intruder as
being between six feet and six feet five inches tall, with a medium build, while the shorter intruder
stood between five feet ten inches and six feet tall, having a skinny, petite build. Because Manning
believed that his dog's behavior toward the intruders indicated that they were familiar to him, he
initially suspected Jeremy Costlow, his former employee who had lived with Manning's daughter and 
tried to rob him once before, as being the shorter of the two assailants. (2) 

 A little over six hours after the robbery took place, off-duty Bell County deputy sheriff Curtis
Nichols was performing security patrol work for a car dealership when he spotted a white Dodge
pickup driving through the lot. Since the dealership was closed for the night, the presence of the
vehicle aroused his suspicion, so he stopped it. Lammons was driving the truck, and Julie Rigsby
was a passenger. In response to Nichols' request, Lammons produced a driver's license. When
Nichols conducted a computer search of the license plate number on the truck, the results showed
the vehicle as being reported stolen from Manning. This caused Nichols to look more closely at the
driver's license which Lammons had produced and Nichols noticed that the photograph on the license
was not a picture of Lammons; the license which Lammons had produced was one issued to
Manning. When Nichols informed Lammons that the vehicle had been reported as stolen, Lammons
attempted to explain the report away by representing "that he was a family member and they had had
a fight, and they were upset, and that's why the truck was reported stolen." Nichols' search of the
vehicle revealed the pistol, .12-gauge shotgun, and .22 rifle which had been in Manning's truck,
together with a jewelry box, several credit cards issued to Manning, ski masks, (3) three pocket knives,
cell phones, and a silver watch. Although Rigsby did not have any money on her person, Lammons
possessed $1,131.00 in cash in one pocket, $37.00 in the other, and a plastic bag full of change was
in the truck. No Smith and Wesson revolver was located. 

 At trial, Lammons pointed the finger at the original suspect who Manning had named:
Costlow. Costlow's wife, Christy, testified that she knew Rigsby and Lammons, that they were
staying at a local park, and that the two stayed the night with the Costlows in their home right behind
Manning's store on August 6. Mrs. Costlow believed that neither Risgby nor Lammons had any
money at that time because they were homeless, staying in parks or abandoned homes. A few hours
before the robbery, they asked to be dropped off at Rose Cemetery, a half mile from Manning's store. 
At their request, Mrs. Costlow let them out of her car at the cemetery about 6:00 or 6:30 p.m. the
evening of the robbery. (4) She claimed that during the time the robbery took place, she was eating
dinner with her husband at a local restaurant, a place where they remained together until 11:00 p.m. 

 Mr. Costlow is six feet tall and weighs 155 to 180 pounds. Lammons is six feet two inches
tall and weighs 155 pounds. Gabbard testified there was no evidence linking Mr. Costlow to the
crime and opined that Mrs. Costlow did not fit the description of either assailant as given by
Manning. Nevertheless, he was of the opinion that the Costlows were somehow involved in the
robbery as well. There were several items stolen from Manning which were not recovered from the
truck during Lammons' arrest, and the investigation led police officers to Mr. Costlow's home, where
they found a revolver and stolen items from a different burglary. Larry Merritt, an inmate housed
in jail with Lammons, testified that Lammons had asked him to provide untrue testimony; Lammons
wanted him to tell the jury that he overheard Mr. Costlow say in church that he (Costlow) had stolen
the truck. Although Merritt indicated that he had never heard Lammons claim that he stole the truck,
Lammons did tell him facts about the robbery and indicated to Merritt that he could not be identified. 

 On appeal, Lammons complains that the fact that he "was found in the victim's vehicle six
hours after the robbery occurred is insufficient" and that the jury's conviction amounted to "no more
than mere suspicion, and required the jury to speculate" on the issue of Lammons' guilt. We disagree
that this is the only inculpatory evidence that the jury heard and disagree with the conclusion. 

II. STANDARD OF REVIEW

 It is well settled in Texas that Lammons' "unexplained possession of property recently stolen
. . . permit[ted] an inference that [he was] the one who committed" the robbery. Poncio v. State, 185
S.W.3d 904, 905 (Tex. Crim. App. 2006); Dixon v. State, 43 S.W.3d 548, 552 (Tex.
App.--Texarkana 2001, no pet.). However, in addition to possession being personal, recent, and
unexplained, Lammons must have distinctly and consciously asserted his right to the property for
the inference to be warranted. Dixon, 43 S.W.3d at 552. In any event, the inference of guilt is not
conclusive, and the sufficiency of the evidence must still be examined according to applicable
standards of review. Id. (citing Hardesty v. State, 656 S.W.2d 73, 77 (Tex. Crim. App. 1983)). 

 Legal and factual sufficiency questions involve separate analyses. The requirement of legal
sufficiency serves as a tool to determine whether submission of an issue is required. Clewis v. State,
922 S.W.2d 126, 132-33 (Tex. Crim. App. 1996). In other words, if the evidence in this case was
insufficient to raise an issue of Lammons' guilt, it should not have been submitted for the jury's
decision, and we must render a judgment of acquittal. Id. When conducting this analysis, we review
all of the evidence in the light most favorable to the verdict and determine whether any rational jury
could find the essential elements of the crime beyond a reasonable doubt. Hooper v. State, 214
S.W.3d 9, 13 (Tex. Crim. App. 2007); Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000)
(citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)); Clewis, 922 S.W.2d at 132-33; Saxton v.
State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). 

 Once we determine the evidence raised issues for the jury's resolution, we will not sit as the
thirteenth juror re-evaluating the weight and credibility of the evidence. Williams v. State, 235
S.W.3d 742, 750 (Tex. Crim. App. 2007); Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App.
1999). Instead, we give full play to the jury's responsibility to weigh the evidence, resolve conflicts
in the testimony, and draw reasonable inferences from basic facts. Johnson v. State, 23 S.W.3d 1, 7
(Tex. Crim. App. 2000); Clewis, 922 S.W.2d at 133; Bottenfield v. State, 77 S.W.3d 349, 354 (Tex.
App.--Fort Worth 2002, pet. ref'd) (citing Jackson, 443 U.S. at 319). 

 On the other hand, because factual sufficiency is an issue of fact, we are not free to re-weigh
the evidence and set aside the jury verdict merely because we feel a different result is more
reasonable. Clewis, 922 S.W.2d at 135. In reviewing Lammons' claim that the evidence in this case
amounted to "no more than a suspicion," we will not engage in a second evaluation of the evidence,
but will only ensure that the jury reached a rational decision. Cuong Quoc Ly v. State, 273 S.W.3d
778, 783 (Tex. App.--Houston [14th Dist.] 2008, pet. ref'd) (citing Muniz v. State, 851 S.W.2d 238,
246 (Tex. Crim. App. 1993)). Thus, we give due deference to its determinations and will find the
evidence factually insufficient only when necessary to prevent manifest injustice. Johnson, 23
S.W.3d at 8-9, 12; Clewis, 922 S.W.2d at 133, 135. Circumstantial evidence is as probative as direct
evidence in establishing the guilt of an actor. Hooper, 214 S.W.3d at 13. As long as the cumulative
force of all incriminating circumstances is sufficient to support Lammons' conviction, each fact need
not directly point to his guilt. Id. (citing Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App.
1993)). 

 In contrast to a legal sufficiency review, we examine the evidence in a neutral light when
assessing factual sufficiency and determine whether the proof of guilt is obviously weak as to
undermine confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so
as to be clearly wrong and unjust. Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003);
Johnson, 23 S.W.3d at 11; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Harris v.
State, 133 S.W.3d 760, 764 (Tex. App.--Texarkana 2004, pet. ref'd). A clearly wrong and unjust
verdict is manifestly unjust, shocks the conscience, or clearly demonstrates bias. Santellan v. State,
939 S.W.2d 155, 165 (Tex. Crim. App. 1997). 

 We also measure the evidence "against the elements of the offense with the same kind of
analysis as that applied in the test for a hypothetically-correct jury charge for the case." (5) Ferralez
v. State, No. 06-08-00064-CR, 2009 WL 454335, at *1 (Tex. App.--Texarkana Feb. 25, 2009, no
pet.) (citing Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); see also Grotti v. State,
273 S.W.3d 273, 280 (Tex. Crim. App. 2008). The hypothetically correct jury charge "sets out the
law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or
unnecessarily restrict the State's theories of liability, and adequately describes the particular offense
for which the defendant was tried." Malik, 953 S.W.2d at 240. It is used to evaluate both legal and
factual sufficiency. Grotti, 273 S.W.3d at 281. 

III. ANALYSIS 

 A. Sufficient Evidence Supported the Rejection of Smalley's Self-Defense Theory

 The hypothetically correct jury charge in this case would require the jury to find that:
1) Lammons, 2) intentionally, knowingly, or recklessly, 3) used or exhibited a weapon, or threatened
or placed another person of at least sixty-five years of age, 4) in fear of imminent bodily injury or
death, 5) while appropriating property, 6) without the lawful owner's consent. Tex. Penal Code
Ann. §§ 29.02, 29.03 (Vernon 2003), § 31.03 (Vernon Supp. 2008).  

 Here, Lammons spent the night in close proximity to Manning's store and home the night
before the robbery. He was found only six hours after the robbery in Manning's truck, carrying a
majority of the stolen loot and exhibiting Manning's driver's license. See Hardesty, 656 S.W.2d at
77 (found inference of guilt where defendant was found with stolen property fifteen days after it was
stolen). Lammons, a man whom Mrs. Costlow had only shortly before the robbery believed to have
been virtually penniless, also had a large amount of cash in his pockets. He clearly lied and claimed
he was Manning's family member when questioned about the stolen car. He fit Manning's
description of the tall intruder, and the testimony of Lammons' cell mate concerning admissions
against interest incriminated him. Lammons was with Rigsby prior to the robbery and Manning
testified the tall intruder referred to the other intruder during the robbery as a "she." We conclude
that the evidence was legally sufficient to submit the question of Lammons' guilt to the jury. 

 Lammons argues that the evidence was factually insufficient because there was no evidence
found in Manning's home that could identify him. He pointed to Mr. and Mrs. Costlow, recounted
that Manning's initial suspect was Mr. Costlow based on his dog's reaction to the intruders, and
generally questioned law enforcement officers' failure to conduct a more thorough investigation and
confirm the Costlows' alibi. Lammons also pointed out that the pistol stolen from Manning's home
was not among the possessions found in the truck, that one was later found in Mr. Costlow's home,
and that it would be difficult for Lammons to travel the distance between Rose Cemetery and
Manning's home on foot in only two hours. It was within the jury's province to resolve any conflicts
in the evidence and decide which version of the events to believe. See Wesbrook v. State, 29 S.W.3d
103, 111-12 (Tex. Crim. App. 2000). The jury was free to disregard evidence regarding the reaction
that Manning's dog had to the intruders and the questions raised by the defense concerning the
Costlows' whereabouts on the night of the robbery. When reviewed in a neutral light, we conclude
the totality of the evidence was factually sufficient to reasonably convict Lammons. His first and
second points of error are overruled. 

 B. State's Closing Arguments Were Not Improper 

 Summation of the evidence, reasonable deduction from the evidence, and answers to
arguments of opposing counsel are proper fodder for jury argument. Felder v. State, 848 S.W.2d 85,
94-95 (Tex. Crim. App. 1992). Even if a jury argument exceeds the bounds of proper argument, an
"erroneous overruling of a defendant's objection is not reversible error unless it affected the
appellant's substantial rights." Montgomery v. State, 198 S.W.3d 67, 95 (Tex. App.--Fort Worth
2006, pet. ref'd); see Tex. R. App. P. 44.2(b). In determining whether Lammons' substantial rights
were affected, we consider the severity of any misconduct, the curative measures, and the certainty
of conviction, absent the misconduct. Montgomery, 198 S.W.3d at 95; Martinez v. State, 17 S.W.3d
677, 692-93 (Tex. Crim. App. 2000). After acknowledging that the police could have further and
more thoroughly investigated the robbery and whereabouts of the Costlows (but did not do so), the
State said:

 But you know what? None of that stuff in any way shows that these defendants aren't
responsible for their crime. Name one piece of evidence that was brought before you
by the State or the defense that shows these defendants are not responsible - - 

 

 [DEFENSE COUNSEL]: Judge, I object to that as an attempt to shift the
burden of proof by the State. 

 

 [STATE]: Judge, I don't have a burden to produce all the evidence, just on
these elements. And I'm not shifting the burden of proof. 

 

 THE COURT: Overruled. 

 

 [STATE]: Any evidence brought forth by the defense or the State that shows
that these defendants didn't commit this offense. Anything. Y'all can consider all the
evidence. The evidence brought by me, the evidence brought by the defendants. (6) 


Lammons argues that these statements shifted the burden of proof to Lammons when the entire
burden of proof remained with the State. (7) However, it appears that the State was simply trying to
emphasize the point that the testimony which might be favorable to show that the Costlows may have
been involved in the robbery in some fashion did not contradict or diminish the proof of Lammons'
guilt of the crime. See Caron v. State, 162 S.W.3d 614, 618 (Tex. App.--Houston [14th Dist.] 2005,
no pet.). Moreover, absent comment on the defendant's lack of testimony, "the State may comment
on appellant's failure to present evidence in his favor" during jury argument. Id. (citing Jackson v.
State, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000)); Sanders v. State, 74 S.W.3d 171, 173 (Tex.
App.--Texarkana 2002, pet. ref'd). Here, when placed in context with the record, the State's jury
argument was proper. (8)


IV. CONCLUSION

 We affirm the judgment of the trial court. 



 Bailey C. Moseley

 Justice


Date Submitted: July 22, 2009

Date Decided: July 23, 2009


Do Not Publish


1. This case was transferred to this Court from the Twelfth District Court of Appeals in Tyler
as a part of the Texas Supreme Court's docket equalization program. We are not aware of any
conflict between the precedent of the Tyler Court with precedent of this Court on any issue relevant
to this appeal. See Tex. R. App. P. 41.3. 
2. Manning also suggested another name, Chad Sorrells, as a potential suspect, but remembered
neither the suggestion nor the name at trial.
3. The ski masks were not logged on the evidence list. 
4. Mrs. Costlow's testimony placed Lammons and Rigsby about four and a half to five miles
from Manning's home two hours before the robbery. 
5. The hypothetically correct jury charge analysis set out in Malik is supposed to be conducted
"even in the absence of alleged jury charge error." Gollihar v. State, 46 S.W.3d 243, 255 (Tex.
Crim. App. 2001). 
6. The State also made the following statement which was not objected to and was not made
the subject of any motion for new trial: "You know what, there's absolutely no evidence that's been
presented at this trial that those defendants got that truck in any way other than the robbery at
Mr. Manning's house . . . ." 
7. The State failed to reply to this point of error in its briefing which focused on whether these
statements commented on Lammons' failure to testify, which was never addressed in Lammons'
brief. "An objection that the State's argument shifts the burden of proof does not comport with an
appellate challenge that the State's argument commented on a defendant's failure to testify." 
Freeman v. State, No. 01-05-01181-CR, 2007 WL 14469, at *2 (Tex. App.--Houston [1st Dist.]
Jan. 4, 2007, pet. ref'd) (mem. op.) (not designated for publication) (citing Paster v. State, 701
S.W.2d 843, 849 (Tex. Crim. App. 1985)). 
8. Nevertheless, curative measures were taken in the form of the court's charge, which stated:
"The law does not require a defendant to prove his innocence or produce any evidence at all. The
presumption of innocence alone is sufficient to acquit the defendant, unless you are satisfied beyond
a reasonable doubt of the defendant's guilt . . . ." Absent any evidence to the contrary, we must
presume the jury followed the court's charge as given. Gamboa v. State, No. AP-75,635, 2009 WL
928552, at *4 (Tex. Crim. App. Apr. 8, 2009); Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim.
App. 1998). Further, even if there had been erroneous argument, an analysis of jury argument error
would require that we weigh three factors to determine if it resulted in harm to Lammons' substantial
rights: (1) severity of the misconduct (the magnitude of the prejudicial effect of the State's remarks);
(2) curative measures taken (the efficacy of any cautionary instruction by the judge); and (3) the
certainty of conviction absent the misconduct (strength of evidence supporting conviction). Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (citing United States v. Millar, 79 F.3d 338,
343 (2nd Cir. 1996); United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994)). This
circumstance would not have met that test for harm.